No. 12-41187

In The
# United States Court of Appeals for the Fifth Circuit

BRADLEY KOENNING, ET AL.,
*Plaintiffs-Appellees,*

v.

KYLE JANEK
*Defendant-Appellant,*

On Appeal from the United States District Court
for the Southern District of Texas, Victoria Division
Case No. 6:11-CV-00006

BRIEF OF *AMICUS CURIAE*
CONSTITUTIONAL ACCOUNTABILITY CENTER
IN SUPPORT OF APPELLEES AND AFFIRMANCE

Rochelle Bobroff
Elizabeth B. Wydra, of Counsel
CONSTITUTIONAL ACCOUNTABILITY CENTER
1200 18th Street, N.W., Suite 501
Washington, D.C. 20036
(202) 296-6889
rochelle@theusconstitution.org

## STATEMENT OF INTERESTED PARTIES AND
## CORPORATE DISCLOSURE STATEMENT

No. 12-41187

*Koenning, et al. v. Janek*

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amicus* states that it is not a publicly-held corporation, does not issue stock and does not have a parent corporation. *Amicus* Constitutional Accountability Center is a non-profit 501(c)(3) organization that acts as a think-tank, public-interest law firm and action center.

Undersigned counsel further certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1.   Those persons and entities listed by Appellants, Appellees, and other *amici* in their respective briefs.

2.   Constitutional Accountability Center

3.   Elizabeth B. Wydra

4.   Rochelle Bobroff

i

 /s/ Rochelle Bobroff
Rochelle Bobroff

CONSTITUTIONAL ACCOUNTABILITY CENTER

*Counsel for Amicus Curiae*

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PARTIES AND
CORPORATE DISCLOSURE STATEMENT............................     i

TABLE OF AUTHORITIES....................................................     v

INTERESTS OF AMICUS CURIAE........................................     1

INTRODUCTION AND SUMMARY OF ARGUMENT..............     2

ARGUMENT.......................................................................     6

I.    The Text and History of the Supremacy Clause and
      Spending Clause Establish the Preemptive Effect
      of Mandatory Medicaid Provisions.................................     6

    A.    The Framers Drafted the Supremacy Clause
      to Ensure Judicial Invalidation of All State
      Laws that Conflict with Federal Law, Permitting
      Enforcement of Federal Law by Private Parties.........     7

    B.    The Framers Intended Federal Statutes Enacted
      Pursuant to The Spending Clause to Have
      Preemptive Force....................................................     12

II.   More Than 200 Years of Precedent Support Judicial
      Review of the Conflict Between Federal and State Law
      in This Case............................................................     17

III.  Medicaid's State Plan Requirements Preempt Contrary
      State Laws and Are Enforceable By Beneficiaries ............     22

CONCLUSION....................................................................     27

**TABLE OF CONTENTS (continued)**

**Page**

CERTIFICATE OF SERVICE.................................................     29

CERTIFICATE OF ELECTRONIC COMPLIANCE.................     31

CERTIFICATE OF COMPLIANCE.......................................     32

# TABLE OF AUTHORITIES

**Page**

## <u>Cases</u>

*Alden v. Maine,*
    527 U.S. 706 (1999).............................................................................21

*Alexander v. Choate,*
    469 U.S. 287 (1985) ...........................................................................25

*Ark. Dept. of Health & Human Servs. v. Ahlborn,*
    547 U.S. 268 (2006) ......................................................................5, 26

*Atkins v. Rivera,*
    477 U.S. 154 (1986) ...........................................................................25

*Blessing v. Freestone,*
    520 U.S. 329 (1997) ........................................................................6, 27

*Board of Trustees of Univ. of Alabama v. Garrett,*
    531 U.S. 356 (2001)............................................................................21

*Chisholm v. Georgia,*
    2 U.S. 419 (1793) ...............................................................................18

*Clapper v. Amnesty, International USA,*
    133 S. Ct. 1138 (2013)…………………………………………………..   1

*Craig v. State of Missouri,*
    29 U.S. 410 (1830). ............................................................................18

*Dodge v. Woolsey,*
    59 U.S. 331 (1855) .............................................................................19

*Dolan v. City of Tigard,*
    512 U.S. 374 (1994) ...........................................................................16

# TABLE OF AUTHORITIES (continued)

**Page**

*Edelman v. Jordan,*
  415 U.S. 651 (1974) ...................................................... 19, 20

*Evergreen Presbyterian Ministries, Inc. v. Hood,*
  235 F.3d 908 (5th Cir. 2000) ........................................... 25

*Ex parte Young,*
  209 U.S. 123 (1908) ......................................................... 19

*Free Enterprise Fund v. Public Co. Accounting Oversight Bd.,*
  130 S.Ct. 3138 (2010) ................................................ 21, 22

*Frew v. Hawkins,*
  540 U.S. 431 (2004) ............................................... 5, 21, 25

*Gibbons v. Ogden,*
  22 U.S. 1 (1824) ........................................................ 4, 18

*Gillman v. City of Phila.,*
  70 U.S. 713 (1866) ......................................................... 19

*Golden State Transit Corp. v. City of L.A.,*
  493 U.S. 103 (1989) ................................................ 20, 27

*Green v. Mansour,*
  474 U.S. 64 (1985) ......................................................... 20

*Harris v. McRae,*
  448 U.S. 297 (1980) ........................................................ 25

*Lankford v. Sherman,*
  451 F.3d 496 (8th Cir. 2006) ...................................... 5, 26

## TABLE OF AUTHORITIES (continued)

**Page**

*McCulloch v. Maryland,*
    17 U.S. 316 (1819) ............................................................ 17

*New Jersey v. Wilson,*
    11 U.S. 164 (1812) ............................................................ 19

*NFIB v. Sebelius,* 132 S. Ct. 2566 (2012)………………………….. 1

*Osborn v. Bank of US,*
    22 U.S. 738 (1824) ...................................................... 18, 19

*PhRMA v. Walsh,*
    538 U.S. 644 (2003) ...................................................... 6, 26

*Planned Parenthood of Houston & Se. Tex. v. Sanchez,*
    403 F.3d 324 (5th Cir. 2005) ............................................ 5

*S.D. v. Hood,*
    391 F.3d 581 (5th Cir. 2004) ......................................... 25

*Spry v. Thompson,*
    487 F.3d 1272 (9th Cir. 2007) ...................................... 24

*United States v. Lopez,*
    514 U.S. 549 (1995) ...................................................... 4, 20

*Va. Office of Prot. & Advocacy v. Stewart,*
    131 S. Ct. 1632 (2011) ............................................... 20, 21

*Westside Mothers v. Olszewski,*
    454 F.3d 532 (6th Cir. 2006) ......................................... 26

*Wilder v. Va. Hosp. Ass'n,*
    496 U.S. 498 (1990) ................................................... 25, 27

# TABLE OF AUTHORITIES (continued)

**Page**

*Wos v. E.M.A.,* No. 12-98,
   2013 WL 1131709 (S. Ct. Mar. 20, 2013) ............................... 1, 5, 26

*Wright v. City of Roanoake Redevelopment
   and Housing Authority,*
   479 U.S. 418 (1987) ........................................................ 27

## Statutes and Regulations

42 U.S.C. § 1320a-2 ............................................................ 5, 23
42 U.S.C. § 1320a-10 .......................................................... 5, 23
42 U.S.C. § 1396a(a)(17) ........................................................ 23
42 U.S.C. § 1396c ........................................................ 6, 24, 25
42 U.S.C. § 1396d(a)(10) ........................................................ 24
42 U.S.C. § 1983 ............................................................... 27
42 U.S.C. § 2000d .............................................................. 23
42 C.F.R. § 440.225 ............................................................ 24

## Constitutional Provisions

U.S. CONST., art. I, § 8, cl. 1 ................................................ 15
U.S. CONST., art. VI, § 2 .............................................. 3, 10, 11

ARTICLES OF CONFEDERATION of 1781, art. III ..................................... 2

## Other Authorities

Bruce Ackerman, *Taxation and the Constitution*,
   99 COLUM. L. REV. 1 (1999) ................................................. 13

AKHIL REED AMAR, AMERICA'S CONSTITUTION:
   A BIOGRAPHY (2005) ..................................................... 10, 14

Akhil Reed Amar, *Of Sovereignty and
   Federalism*, 96 YALE L.J. 1425 (1987) ...................................... 10

# TABLE OF AUTHORITIES (continued)

**Page**

18 THE WRITINGS OF GEORGE WASHINGTON
    FROM THE ORIGINAL MANUSCRIPT
    SCOURES 1745-1799 (John C.
    Fitzpatrick ed., 1931) ....................................................................... 13

Gillian E. Metzger, *To Tax, To Spend, To
    Regulate*, 126 HARV. L. REV. 83 (2012) ........................................... 13

JACK N. RAKOVE, ORIGINAL MEANINGS: POLITICS
    AND IDEAS IN THE MAKING OF THE CONSTITUTION (1996) .................. 7

## Miscellaneous

THE FEDERALIST NO. 18 (Alexander Hamilton & James Madison)......... 11
THE FEDERALIST NO. 19 (Alexander Hamilton &James Madison).......... 11
THE FEDERALIST NO. 20 (Alexander Hamilton & James Madison)......... 11
THE FEDERALIST NO. 30 (Alexander Hamilton).................................. 15, 16
THE FEDERALIST NO. 33 (Alexander Hamilton)................................. 11, 12
THE FEDERALIST NO. 44 (James Madison) .......................................... 3, 12

RECORDS OF THE FEDERAL CONVENTION
    OF 1787 (Max Farrand ed., 1911)..................2, 7, 8, 9, 10, 13, 14, 15

## INTERESTS OF AMICUS CURIAE[1]

Constitutional Accountability Center (CAC) is a think tank, public interest law firm, and action center dedicated to fulfilling the progressive promise of our Constitution's text and history. CAC works in our courts, through our government, and with legal scholars to improve understanding of the Constitution and to preserve the rights and freedoms it guarantees. CAC has a strong interest in constitutional federalism and in preserving the federal powers granted by the Constitution. Accordingly, CAC has an interest in the interaction between the Supremacy Clause and the Spending Clause raised in this case. CAC has filed numerous *amicus curiae* briefs in the Supreme Court in cases raising significant issues regarding the text and history of the original Constitution and the Bill of Rights, including *Wos v. E.M.A.,* No. 12-98, 2013 WL 1131709 (S. Ct. Mar. 20, 2013); *Clapper v. Amnesty, International USA,* 133 S. Ct. 1138 (2013); and *NFIB v. Sebelius,* 132 S. Ct. 2566 (2012).

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(c)(5), *amicus* states no counsel for a party authored this brief in whole or in part, and no counsel or party made a monetary contribution intended to fund the preparation or submission of this brief. No person other than *amicus curiae* or its counsel made a monetary contribution to its preparation or submission.

This brief is filed with the consent of all parties, pursuant to Federal Rule of Appellate Procedure 29(a).

## INTRODUCTION AND
## SUMMARY OF ARGUMENT

Appellant contends that Medicaid is "spending legislation" that "does not obligate the States to do *anything*." App. Br. at 26-27 (emphasis in original). This argument was not presented below. But if the Court decides to entertain this argument, it should be rejected. Appellant's position is contrary to the text and history of our Constitution, more than 200 years of precedent upholding the supremacy of federal law, and the clear language of the Medicaid statute.

The drafters of our Constitution were acutely aware of the dysfunction of the Articles of Confederation, which established a loose confederacy built merely on a "firm league of friendship" among thirteen independent states. ARTICLES OF CONFEDERATION of 1781, art. III. The "business" of the Constitutional Convention was to correct the "vices" resulting from the lack of "effectual controul in the whole over its parts." 1 RECORDS OF THE FEDERAL CONVENTION OF 1787, at 167 (Max Farrand ed., 1911) [hereinafter RECORDS] (statement of James Wilson of

Pennsylvania). The Framers viewed a government lacking a supreme federal power as "a monster, in which the head was under the direction of the members." THE FEDERALIST NO. 44 (James Madison).

The delegates to the Constitutional Convention considered assigning the task of enforcing the supremacy of federal law to the military and Congress. If the Constitution had been written that way, then private parties would have no role in the invalidation of state statutes that conflict with federal law. But the Framers instead chose to rely upon judicial review of cases brought by injured parties, including private individuals. The Constitution's Supremacy Clause thus provides a mandate for the judicial branch to void "any Thing" in state law to the "Contrary" of federal law. U.S. CONST. art. VI, § 2. Instead of assigning the executive or legislative branches an exclusive role in bringing litigation to uphold federal law, the text of the Supremacy Clause is broadly worded to confer a right to relief upon the people, as well.

There is no reason in the Constitution's text or history to exclude federal law enacted pursuant to Congress's powers under the Spending Clause from the standard preemption jurisprudence of the Supremacy

Clause. Indeed, the history of the Spending Clause shows that the Framers intended to grant power to the federal government to displace state law when the national interest required. The focus of the Founding generation on the need for federal power to supplant inadequate or parochial state laws demonstrates that Spending Clause legislation was clearly intended to have preemptive effect.

In line with this text and original meaning, for more than 200 years the judicial branch has permitted suits, including those brought by private parties, to challenge state laws that allegedly violate federal law and requirements. As Chief Justice John Marshall explained, the Framers expected that some state laws would conflict with federal statutes and in "every such case" the law of the state "must yield" to federal law. *Gibbons v. Ogden*, 22 U.S. 1, 211 (1824). It is imperative for constitutional federalism that the Supremacy Clause be applied properly; as Justice Kennedy has observed, "the whole jurisprudence of preemption" is of vital importance to "maintaining the federal balance." *United States v. Lopez*, 514 U.S. 549, 578 (1995) (Kennedy, J., concurring).

The Supreme Court, this Court, and sister circuits have upheld the preemptive effect of Spending Clause statutes, including Medicaid, in numerous cases. *See, e.g.*, *Wos v. E.M.A.*, No. 12-98, 2013 WL 1131709 (S. Ct. Mar. 20, 2013), slip op. at 7-8; *Ark. Dept. of Health & Human Servs. v. Ahlborn*, 547 U.S. 268, 292 (2006); *Planned Parenthood of Houston & Se. Tex. v. Sanchez*, 403 F.3d 324, 333-35 (5th Cir. 2005); *Lankford v. Sherman*, 451 F.3d 496, 510 (8th Cir. 2006). Texas's contention that the Medicaid Act *as a whole* has no preemptive effect is contrary to well-established precedent holding that states accepting federal Medicaid funds must comply with the mandatory terms of the statute. *See, e.g.*, *Frew v. Hawkins*, 540 U.S. 431, 433 (2004). The Medicaid provisions at issue in this case are, indeed, mandatory, and impose binding obligations on the States. While the applicable provision is contained within a list of State plan requirements, Congress has specified that State plan requirements are privately enforceable. 42 U.S.C. §§ 1320a-2, 1320a-10 (2006).

Texas's argument that the preemptive force of the Medicaid statute is eliminated by the power of the federal government to withhold funds is baseless. Nothing in the text of the Medicaid statute,

including the provision authorizing federal sanctions for failure to comply, 42 U.S.C. § 1396c, alters the compulsory nature of Medicaid requirements.   The Supreme Court has repeatedly permitted private enforcement of Medicaid, ignoring or rejecting arguments that the reduction of federal funding is the exclusive remedy.   *See, e.g.*, *Pharm. Research & Mfrs. of Am. v. Walsh,* 538 U.S. 644 (2003) [hereinafter *PhRMA v. Walsh*]; *Blessing v. Freestone*, 520 U.S. 329, 348 (1997).

## ARGUMENT

## I.   The Text and History of the Supremacy Clause and Spending Clause Establish the Preemptive Effect of Mandatory Medicaid Provisions

The Constitution grants specific law-making powers to the federal government, in order to allow Congress to legislate for the country as a whole whenever a national solution is necessary or preferable.   The Framers wrote the Supremacy Clause into the Constitution to ensure that federal laws properly enacted under these powers would displace conflicting state law.   The Spending Clause is an integral part of the Framers' vision of federal power, and laws enacted pursuant to Congress's spending power clearly have preemptive force.   Appellant's

assertion that mandatory provisions in the Medicaid statute do not preempt contrary state laws should be rejected, if considered at all.

**A.    The Framers Drafted the Supremacy Clause to Ensure Judicial Invalidation of All State Laws that Conflict with Federal Law, Permitting Enforcement of Federal Law by Private Parties**

At the Constitutional Convention in 1787, James Wilson of Pennsylvania explained that "the business of this convention" is to correct the "vices" of the Articles of Confederation, including "the want of effectual controul in the whole over its parts." 1 RECORDS, at 167. The Framers viewed the failure of the Articles of Confederation to ensure the supremacy of federal law as a "fatal omission." JACK N. RAKOVE, ORIGINAL MEANINGS: POLITICS AND IDEAS IN THE MAKING OF THE CONSTITUTION 167 (1996). The Founding generation extensively debated different possible means for the invalidation of state laws in conflict with federal law. Ultimately, the Framers selected judicial review in suits that could be brought by private parties as the constitutional mechanism to void contrary state laws.

Initially, Governor Edmund Randolph of Virginia proposed that the "National Legislature" be given the power "to negative all laws passed by the several States," as well as the power "to call forth the force of the Union" against a state "failing to fulfill its duties," in order to ensure the supremacy of federal law. 1 RECORDS, at 21. While James Madison supported the legislative "negative," he strongly disagreed with reliance upon military force to resolve conflicts between federal and state law. He stated: "The use of force agst. a State, would look more like a declaration of war, than an infliction of punishment, and would probably be considered by the party attacked as a dissolution of all previous compacts by which it might be bound." *Id*. at 54. Randolph was persuaded to change his position, agreeing that the use of force would be "impracticable, expensive [and] cruel to individuals." *Id*. at 256 (emphasis omitted).

While Madison convinced his colleagues to relinquish the military option, he could not persuade them to embrace the use of congressional power to invalidate state laws. His reasoning in support of the congressional negation of state law met with fierce resistance, precisely

because a majority of delegates preferred to rely on judicial review for this important task. 2 RECORDS, at 27-28. During the debate on the "congressional negative," Gouverneur Morris of New York and Roger Sherman of Connecticut insisted that the responsibility to invalidate conflicting state laws was properly in the province of the judiciary. *Id*. The proposal for Congress to nullify state laws was defeated by a vote of three states in favor to seven states against. *Id*. at 28.

Immediately after the defeat of the "congressional negative," Luther Martin of Maryland proposed a constitutional clause stating "that the Legislative acts of the [United States] . . . shall be the supreme law of the respective States . . . [and] that the Judiciaries of the several States shall be bound thereby in their decisions, any thing in the respective laws of the individual States to the contrary notwithstanding." *Id*. at 28-29. Martin's proposal passed unanimously without debate. *Id*. at 29. John Rutledge of South Carolina recommended adding that the United States Constitution is supreme to state laws, a proposal that likewise passed without dissent. *Id*. at 389. The Committee on Detail changed the phrase "the Judiciaries of the several States" to "the judges in the several states." *Id*. at 183. As

modified, the clause required both state and federal courts to uphold the supremacy of federal law.

Significantly, the Committee on Style Revision replaced the words "the supreme law of the states" with the phrase "the supreme law of the land." *Id.* at 603. Professor Amar explains that "the implication was continental: one Constitution, one land, one People." Akhil Reed Amar, *Of Sovereignty and Federalism*, 96 YALE L.J. 1425, 1458 (1987). The Founding generation believed that federal laws "would embody the judgment of America as a whole, as distinct from the more parochial view of any particular local part," and therefore federal statutes have "priority over any inconsistent state-law norm." AKHIL REED AMAR, AMERICA'S CONSTITUTION: A BIOGRAPHY 300 (2005). The Supremacy Clause establishes federal law as embodying the will of the nation's people, who are empowered to turn to the judiciary for enforcement.

The words of the Supremacy Clause, as finalized, provide:

This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

U.S. CONST. art. VI, § 2.  Thus, all constitutional federal laws are the supreme law of the land, with no exceptions envisioned in the text.  The Supremacy Clause does not restrict enforcement of federal law to suits brought by Congress or the executive branch, allowing private individuals to invoke judicial review to invalidate conflicting state laws.

During ratification, the Framers devoted considerable attention to the importance of the Supremacy Clause as a justification for the people to vote in favor of the Constitution.  In the *Federalist Papers*, James Madison and Alexander Hamilton jointly wrote essays criticizing historical examples in which the national government had no means of enforcing its will over independent and sovereign states.  THE FEDERALIST NOS. 18, 19, 20 (Alexander Hamilton & James Madison).  They mocked governments lacking federal supremacy as prone to anarchy, imbecility, and discord.  *Id.* They jointly concluded that a government established as "a sovereignty over sovereigns" is in practice "subversive of the order and ends of civil polity."  THE FEDERALIST NO. 20 (Alexander Hamilton & James Madison).   Writing separately, Hamilton asserted that if the "laws of the Union" are not "the SUPREME LAW of the land," then "they would amount to nothing."

THE FEDERALIST NO. 33 (Alexander Hamilton).    Madison similarly declared that without the Supremacy Clause, the Constitution "would have been evidently and radically defective." THE FEDERALIST NO. 44 (James Madison).   He likened a government that did not enforce the supremacy of federal law to "a monster, in which the head was under the direction of the members." *Id.*

The Framers viewed the supremacy of federal law as a critically important facet of the new government.   They explicitly rejected exclusive assignment of this task to the executive and legislative branches.   Instead, they opened the courthouse doors to suits by private parties, as well as governmental parties, with no exception for claims brought under Spending Clause statutes.

## B.    The Framers Intended Federal Statutes Enacted Pursuant to The Spending Clause to Have Preemptive Force

The failure of the Articles of Confederation to establish federal supremacy had been especially damaging with regard to the federal government's inability to tax and spend for the defense and general interests of the nation.   Under the Articles of Confederation, Congress could raise money only by making requests to the States, but the States

failed to provide the requested funds "on a massive scale." Gillian E. Metzger, *To Tax, To Spend, To Regulate*, 126 HARV. L. REV. 83, 89 (2012). This created such an ineffectual central government that, according to George Washington, it nearly cost Americans victory in the Revolutionary War, and he lamented the dire situation in which the soldiers had been placed as a result of Congress's inability to levy taxes to support the Army. *See* 18 THE WRITINGS OF GEORGE WASHINGTON FROM THE ORIGINAL MANUSCRIPT SCOURES 1745-1799 453 (John C. Fitzpatrick ed., 1931) (Letter to Joseph Jones, May 31, 1780). The need "to provide adequate fiscal powers for the national government" motivated the Framers to write a new Constitution. Bruce Ackerman, *Taxation and the Constitution*, 99 COLUM. L. REV. 1, 6 (1999).

The Constitutional Convention sought to remedy this problem by authorizing Congress to raise and spend national funds for broad national goals. The initial proposal set forth by Governor Randolph began with the resolution "that the articles of Confederation ought to be so corrected [and] enlarged as to accomplish the objects proposed by their institution; namely 'common defence, security of liberty, and general welfare.'" 1 RECORDS, at 20. Randolph suggested that Congress

be assigned the power "to legislate in all cases to which the separate States are incompetent, or in which the harmony of the United States may be interrupted by the exercise of individual Legislation." *Id.* at 21. This assignment of broad legislative powers passed overwhelmingly. *Id.* at 47, 53-54. The Framers later added the power "to legislate in all cases for the general interests of the Union." 2 RECORDS, at 26-27.

The delegates gave directions for drafting the powers of the national legislative branch to the Committee of Detail, "which took upon itself the task of translating these instructions into the specific enumerations of Article I." AMAR, AMERICA'S CONSTITUTION, at 108 n.*. The delegates' instructions described the "legislative Rights vested in Congress" as including the authority "to legislate in all Cases for the general Interests of the Union, and also in those Cases to which the States are separately incompetent, or in which the Harmony of the United States may be interrupted by the Exercise of individual Legislation." RECORDS, Vol. 2, at 131-32. The Framers tied the broad legislative powers of Congress to the need to supplant individual state legislation.

The ultimate text of the Spending Clause in Article I was drafted by the Convention's Third Committee of Eleven. *Id.* at 481. The Committee of Eleven added to Article I that Congress shall have the power to "provide for the common defence and general welfare of the United States." *Id.* at 493, 497. *Cf.* 1 RECORDS, at 20 (Randolph's first resolution seeking "common defence" and "general welfare").

As finalized, the text of the Spending Clause provides in pertinent part: "The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States . . . ." U.S. CONST. art. I, § 8, cl. 1. The Spending Clause is the first power, and one of the most sweeping powers, that the Constitution confers upon Congress. The Framers noted in their instructions to the Committee of Detail that laws for the general interests of the nation were needed to supersede more insular or ineffective state laws. 2 RECORDS, at 131-32. Thus, laws enacted pursuant to the Spending Clause's "general welfare" provision were clearly intended to have preemptive force.

Hamilton explained in the Federalist Papers that the power to tax and spend is "an indispensable ingredient in every constitution." THE

FEDERALIST NO. 30 (Alexander Hamilton). He noted that it was essential for the Constitution to "embrace a provision for the support of the national civic list; for the payment of the national debts contracted, or that may be contracted; and, in general, for all those matters which will call for disbursements out of the national treasury." *Id.*

The text and history of the Spending Clause demonstrate the Framers' intent to provide Congress with broad spending powers in order to displace inadequate or parochial state legislation related to national issues. In early drafts, the Convention delegates described Congress's power as encompassing the "general Interests of the Union" and the "Harmony of the United States." The final text utilized the equally expansive term: "general Welfare of the United States." In all these iterations, the Framers conferred far-reaching powers on Congress to spend federal revenues for the benefit of the nation's people, supplanting contrary state laws.

Appellant effectively seeks to relegate the Spending Clause to the status of a "poor relation" when it comes to the application of the Supremacy Clause to Spending Clause legislation, *c.f. Dolan v. City of Tigard,* 512 U.S. 374, 392 (1994). Yet, the Spending Clause is as much

a part of Article 1, Section 8 as the other enumerated powers, and this Court should reject this invitation.

## II.    More Than 200 Years of Precedent Support Judicial Review of the Conflict Between Federal and State Law In This Case

Appellant contends that "even if" Texas's written policy "conflicts" with the Medicaid statute, the federal law has no preemptive effect. App. Br. 29.   This argument is contrary to the balance of powers established by the Constitution and enforced by the judicial branch for centuries.

Chief Justice Marshall eloquently explained the importance of the supremacy of federal law in our system of government:

> If any one proposition could command the universal assent of mankind, we might expect it would be this—that the government of the Union, though limited in its powers, is supreme within its sphere of action.   This would seem to result, necessarily, from its nature. It is the government of all; its powers are delegated by all; it represents all, and acts for all.   Though any one State may be willing to control its operations, no State is willing to allow others to control them.   The nation, on those subjects on which it can act, must necessarily bind its component parts.

*McCulloch v. Maryland*, 17 U.S. 316, 405 (1819).   Writing for the Supreme Court, Marshall noted that the "framers of our constitution foresaw" that states would pass laws conflicting with federal laws, and

"[i]n every such case, the act of Congress, or the treaty, is supreme; and the law of the State, though enacted in the exercise of powers not controverted, must yield to it." *Gibbons v. Ogden*, 22 U.S. 1, 210-11 (1824). Marshall acknowledged the argument that the dignity of the state could be wounded by the "humiliation" of submitting to a judicial tribunal, but the Chief Justice noted the "still superior dignity of the people of the United States." *Craig v. Missouri*, 29 U.S. 410, 437 (1830). He explained that a state law "repugnant" to a federal statute will "furnish no authority" to those who relied upon the state statute. *Osborn v. Bank of US*, 22 U.S. 738, 859 (1824).

Appellant hypothesizes that the founding generation would have had a "fierce reaction" to suits under the Supremacy Clause against state officials, extrapolating from the passage of the Eleventh Amendment in response to *Chisholm v. Georgia*, 2 U.S. 419 (1793). App. Br. 16. This argument conjectures that state officials were not sued in the nation's early years under the Supremacy Clause. But in fact, the founding generation emphatically enforced the Supremacy Clause against state officials. For instance, in *Osborn*, the Supreme Court expressed its approval of a federal court suit brought by a bank

18

against state officials to obtain a declaration that a state law was void for being contrary to federal law. The Supreme Court explained: "It was proper, then, to make a decree against the defendants in the Circuit Court, if the law of the State of Ohio be repugnant to the constitution, or to a law of the United States made in pursuance thereof, so as to furnish no authority to those who took, or to those who received, the money for which this suit was instituted." *Osborn*, 22 U.S. at 859.

In the first century of this country's history, suits to enforce the supremacy of federal law were not limited to actions by government actors. Individuals bringing private suits readily obtained judicial review to determine whether a state law contravened federal law. *See, e.g.*, *Gillman v. City of Phila.*, 70 U.S. 713, 722-24 (1866); *Dodge v. Woolsey*, 59 U.S. 331, 341 (1855); *New Jersey v. Wilson*, 11 U.S. 164, 166-67 (1812).

In 1908, in *Ex parte Young*, 209 U.S. 123 (1908), the Supreme Court firmly cemented the right of individuals to seek the protection of the judicial branch to obtain injunctive relief to invalidate a state law conflicting with federal law. *Ex parte Young* was a "watershed case" providing prospective relief that is "analogous" to the modern day

injunction enjoining state officials from failing to comply with federal regulations. *Edelman v. Jordan*, 415 U.S. 651, 664 (1974). As then-Associate Justice Rehnquist reiterated a decade later, "the availability of prospective relief of the sort awarded in *Ex parte Young* gives life to the Supremacy Clause. Remedies designed to end a continuing violation of federal law are necessary to vindicate the federal interest in assuring the supremacy of that law." *Green v. Mansour*, 474 U.S. 64, 68 (1985).

Justice Kennedy has similarly observed that "the whole jurisprudence of preemption" is of vital importance to "maintaining the federal balance." *United States v. Lopez*, 514 U.S. 549, 578 (1995) (Kennedy, J., concurring). As a result, even when there is no statutory right of action, private individuals may bring "pre-emption claims by seeking declaratory and equitable relief in the federal district courts through their powers under federal jurisdictional statutes." *Golden State Transit Corp. v. City of L.A.,* 493 U.S. 103, 119 (1989) (Kennedy, J., dissenting). In recent years, the Supreme Court has "expanded the *Young* exception far beyond its original office" and "defined important limits on *Young* in order to respect state sovereignty while still

adhering to principles necessary to implement the Supremacy Clause."
*Va. Office of Prot. & Advocacy v. Stewart*, 131 S. Ct. 1632, 1642-43
(2011), (Kennedy, J., concurring).   As Justice Kennedy wrote for the
unanimous Court in a case involving the enforcement of Medicaid,
private individuals may bring "suits for prospective injunctive relief
against state officials acting in violation of federal law."   *Frew v.
Hawkins*, 540 U.S. 431, 437 (2004).

Appellant's reliance on *Alden v. Maine*, 527 U.S. 706 (1999), to
argue that there is no private right of action to sue state officials to
enforce the Supremacy Clause is of no avail.   App Br. 16, n. 8.   In *Alden*,
the Court held that the Eleventh Amendment barred claims for
damages, but the Court observed that sovereign immunity "does not bar
certain actions against state officers for injunctive or declaratory relief."
*Alden*, 527 U.S. at 757.   In *Board of Trustees of Univ. of Alabama v.
Garrett*, 531 U.S. 356, 374 n.9 (2001), the Court reiterated that suits to
force states to comply with federal law may be brought "by private
individuals in actions for injunctive relief under *Ex parte Young*." *See
also Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*, 130

S.Ct. 3138, 3151 n.2 (2010) ("right to [injunctive] relief as a general matter" to enforce the Constitution under *Ex parte Young*).

Throughout our nation's history, the judicial branch has fulfilled its constitutional duty to invalidate state statutes that conflict with federal law. Courts have continually emphasized the importance of the role of the judiciary in upholding the supremacy of federal law. More than 200 years of precedent establish that a state law in direct conflict with federal statutory requirements cannot evade the force of the Supremacy Clause. Appellant's argument to the contrary is utterly without merit.

## III. Medicaid's State Plan Requirements Preempt Contrary State Laws and are Enforceable by Beneficiaries

Appellant asserts that a "State may establish a Medicaid program that deviates from [federal law] at any time, and then wait to see if the Secretary will turn off the spigot or merely reduce the amount of funding." App. Br. 29. This contention that the Medicaid statute permits states to ignore Medicaid's provisions is contrary to the clear language of the statute and the jurisprudence of the Supreme Court, this Court, and sister circuits enforcing Medicaid.

Texas contends that the Medicaid statute does not contain language similar to Title VI's mandatory statement: "No person in the United States shall . . . ." App. Br. 28, citing 42 U.S.C. § 2000d (2006). But simply reading the Medicaid statute shows otherwise.

The relevant provision of Medicaid addressing reasonable standards, 42 U.S.C. § 1396a(a)(17), is contained in an extensive list of Medicaid State plan requirements. The section begins with the phrase: "A State plan for Medical Assistance must . . . (a)(17) ... include reasonable standards. . . ." 42 U.S.C. § 1396a(a)(17) (2006). Like the language of Title VI, this language is obligatory. Moreover, Congress has clarified that in a private "action brought to enforce a provision of this chapter, such provision is not to be deemed unenforceable because of its inclusion in a section of this chapter requiring a State plan or specifying the required contents of a State plan." 42 U.S.C. §§ 1320a-2, 1320a-10 (2006). Congress has clearly expressed its intention that State plan requirements impose enforceable obligations on States.

Appellant urges the Court to treat mandatory Medicaid provisions as if they were optional. But that would be contrary to the express

language of the statute and the clear intent of Congress as set out in the text.

Some provisions of Medicaid are indeed optional. For example, dental care for adults is not a mandatory Medicaid service but rather "*may* be furnished under the State plan *at the State's option*." 42 C.F.R. § 440.225 (2012) (emphasis added). *See* 42 U.S.C. § 1396d(a)(10) (2006). If a State declines to include optional services, such as dental care for adults, in its State plan, the State will not be violating federal law, but will simply receive less federal reimbursement. The Medicaid statute also permits the federal government to waive certain requirements for "demonstration projects" in which "the state expands its coverage in an experimental plan." *Spry v. Thompson*, 487 F.3d 1272, 1273-74 (9th Cir. 2007).

Appellant does not claim that the federal government has waived the applicable provisions of the Medicaid statute in this case. Similarly, appellant does not deny, nor can he, that the relevant provisions are couched in mandatory terms.

Instead, Appellant contends that the Medicaid provision regarding federal government oversight, 42 U.S.C. § 1396c, gives states total

discretion whether or not to comply with the requirements of the Medicaid program. App. Br. 28. Appellant suggests that this provision renders all the mandatory language in Medicaid merely precatory and not preemptive. But there is nothing in the text of § 1396c that modifies the binding obligations imposed throughout the Medicaid statute.

The Supreme Court has repeatedly held that States choosing to participate in the federal Medicaid program must comply with the mandatory provisions of Medicaid. For instance, the Supreme Court instructed that "State participation is voluntary; but once a State elects to join the program, it must administer a state plan that meets federal requirements." *Frew v. Hawkins*, 540 U.S. 431, 433 (2004). *Accord Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498, 502 (1990); *Atkins v. Rivera*, 477 U.S. 154, 156-57 (1986); *Alexander v. Choate,* 469 U.S. 287, 289 n.1, (1985); *Harris v. McRae*, 448 U.S. 297, 301 (1980). This Circuit has cited these Supreme Court cases for the principle that states accepting Medicaid funds must spend them in accordance with federal requirements. *See, e.g., S.D. v. Hood,* 391 F.3d 581, 586 (5th Cir. 2004); *Evergreen Presbyterian Ministries, Inc. v. Hood,* 235 F.3d 908, 915 (5th

Cir. 2000).  Sister circuits are in accord.  *See, e.g., Westside Mothers v. Olszewski*, 454 F.3d 532, 535 (6th Cir. 2006); *Lankford v. Sherman*, 451 F.3d 496, 504 (8th Cir. 2006).

The argument that the federal power to terminate funds precludes private enforcement of Medicaid has been made before in the Supreme Court but has never held sway.  *See, e.g.*, *PhRMA v. Walsh,* 538 U.S. 644, 675 (2003) (Scalia, J., concurring).   In fact, in the *Ahlborn* case brought by a Medicaid beneficiary, the Supreme Court unanimously held that a Medicaid provision had preemptive effect, finding that an Arkansas law was "unenforceable" because the state statute permitted a lien in contravention of the same Medicaid provisions at issue in the instant case.  547 U.S. 268, 292 (2006).  The Court noted that in return for federal Medicaid funds, States must "compl[y] with certain statutory requirements for making eligibility determinations, collecting and maintaining information, and administering the program."  *Id*. at 275. In line with *Ahlborn*, the Supreme Court just issued a decision in *Wos v. E.M.A.,* No. 12-98, 2013 WL 1131709 (S. Ct. Mar. 20, 2013), emphasizing the preemptive power of the Medicaid statute. The majority opinion, authored by Justice Kennedy and joined by five other

Justices, held that a North Carolina lien statute was preempted by the Medicaid anti-lien provision.

Similarly, in the context of private suits under 42 U.S.C. § 1983, the Supreme Court has rejected the argument that the federal government's power to reduce funding precludes private enforcement. The Court explained that "the Secretary's oversight powers are not comprehensive enough to close the door on § 1983 liability." *Blessing v. Freestone*, 520 U.S. 329, 348 (1997). The ability of the federal government to withhold approval of Medicaid State plans and "to curtail federal funds to States whose plans are not in compliance with the Act" does not "withdraw the private remedy under § 1983." *Wilder*, 496 U.S. at 521-22. *Accord Golden State Transit Corp. v. City of L.A.*, 493 U.S. 103, 106 (1989); *Wright v. City of Roanoake Redevelopment and Housing Authority*, 479 U.S. 418, 428 (1987).

The argument urged by Appellant has no basis in any precedent of the Supreme Court or this Court, and is contrary to the text and history of the Constitution and the clear language of the Medicaid statute.

## CONCLUSION

The decision of the district court should be affirmed.

Respectfully submitted,


/s/ Rochelle Bobroff
ROCHELLE BOBROFF
ELIZABETH B. WYDRA, of Counsel
CONSTITUTIONAL ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, D.C.  20036
(202) 296-6889
rochelle@theusconstitution.org

*Counsel for Amicus Curiae*

March 20, 2013

# CERTIFICATE OF SERVICE

I certify that on this 20th day of March, 2013, this document was filed with the Clerk of this Court electronically and served by operation of the ECF system on all counsel of record:

Jonathan F. Mitchell
Rance L. Craft
Douglas D. Geyser
Michael P. Murphy
Drew L. Harris
Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
512-936-1695 (Phone)
512-474-2697 (Fax)
*Counsel for Defendant-Appellant*

Maureen A. O'Connell
Southern Disability Law Center
1307 Payne Avenue
Austin, TX 78757-0000
512-458-5800 (Phone)
512-458-5850 (Fax)

Maryann Overath
1404 Crestwood Road
Austin, TX 78722
512-587-1614 (Phone)
512-597-4163 (Fax)

Martha Jane Perkins
Sarah Jane Somers
National Health Law Program, Inc.
Suite G-7
101 E. Weaver Street
Carrboro, NC 27510
919-968-6308 (Phone)
919-968-8855 (Fax)
*Counsel for Plaintiffs-Appellees*

Lewis Golinker
401 East State Street
Ithaca, New York 14850
607-277-7286 (Phone)
607-277-5239 (Fax)

James R. Sheldon
Diana M. Straube
Neighborhood Legal Services, Inc.
237 Main Street, Suite 400
Buffalo, New York 14203
(716) 847-0650 (phone)
(716) 847-0227 (fax)
*Counsel for Amici Curiae, the Arc, et al.*

/s/ Rochelle Bobroff
Rochelle Bobroff

*Counsel for amicus curiae
Constitutional Accountability Center*

**CERTIFICATE OF ELECTRONIC COMPLIANCE**

Counsel certifies that on March 20, 2013, this brief was transmitted to Mr. Lyle W. Cayce, Clerk of the United States Court of Appeals for the Fifth Circuit, via the Court's CM/ECF Document Filing System, https://ecf.ca5.uscourts.gov/. Counsel further certifies that: (1) required privacy redactions have been made, 5th Cir. R. 25.2.13; (2) the electronic submission is an exact copy of the paper document, 5th Cir. R. 25.2.1; and (3) the document has been scanned with the most recent version of F-Secure PSB Workstation Security and is free of viruses.

/s/ Rochelle Bobroff
Rochelle Bobroff

*Counsel for amicus curiae*
*Constitutional Accountability Center*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Fed. R. App. P. 29(d) because it contains 5,391 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Circuit Rule 32(a)(1).

I further certify that the attached *amicus* brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)and the type-style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 2007 14-point Century Schoolbook font in text and 12-point font in footnotes.

Executed this 20th day of March, 2013.

/s/ Rochelle Bobroff
Rochelle Bobroff
CONSTITUTIONAL ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, D.C.  20036
(202) 296-6889
rochelle@theusconstitution.org

*Counsel for amicus curiae*
*Constitutional Accountability Center*